UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

RAGOW HOLDINGS LTD.

          Plaintiff,

                          CASE NO.:

v.

AZIMUT BENETTI SERVICE
USA, INC., a Florida Corporation,
AZIMUT-BENETTI, S.p.A, a Foreign
Corporation, and MARINEMAX
EAST, INC., a Florida Corporation,

          Defendants.

_____/

## **COMPLAINT**

Plaintiff, RAGOW HOLDINGS LTD. (hereinafter "Plaintiff"), by and through its undersigned counsel, hereby files this Complaint and sues Defendants, AZIMUT-BENETTI, S.p.A. (hereinafter "Azimut"), AZIMUT BENETTI SERVICE USA, INC. (hereinafter "Azimut"), and MARINEMAX EAST, INC. (hereinafter "MarineMax"), and alleges:

### **INTRODUCTION**

1.    On March 25, 2009, Fernando Schutte ("Schutte") purchased a new, 2009, forty-three foot Azimut Flybridge, Model AZ43-FLY, Hull Identification Number XAX435431809 (hereinafter "the Vessel"), from MarineMax on behalf of the Plaintiff. Plaintiff took delivery of the Vessel on April 29, 2009. However, Plaintiff has been unable to use and enjoy the Vessel as it is plagued with major material defects.

2.    Plaintiff has given MarineMax and Azimut numerous attempts to repair and cure the material defects described above. However, MarineMax and Azimut despite their best efforts have failed to cure these problems. As a result, Plaintiff has been left with a vessel in a manner

1

not as promised and represented. Accordingly, Plaintiff's only redress is to return the Vessel to Azimut and MarineMax and to seek recovery for the out of pocket expenses it has incurred in maintaining an inoperable vessel.

3.      This is an action to revoke Plaintiff's acceptance of the Vessel, rescind the purchase of the Vessel, for damages stemming from breaches of warranty, and for civil damages pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301.

### THE PARTIES, JURISDICTION AND VENUE

4.      This is an action in excess of $75,000.00, exclusive of interest, costs and attorney's fees.

5.      At all times relevant to this Complaint, Plaintiff, RAGOW HOLDINGS LTD., is a foreign corporation organized and existing under the laws of the British Virgin Islands.

6.      At all times relevant to this Complaint, Defendant, AZIMUT-BENETTI, S.p.A is a foreign corporation organized and existing under the laws of Italy and doing business in Florida through its wholly-owned subsidiary, AZIMUT BENETTI SERVICE USA, INC., a corporation organized and existing under the laws of the State of Florida, with its principal place of business located at 1883 W. SR84, Suite 103, Ft. Lauderdale, Florida, 33315, and its registered agent John H. Friedhoff, located at 1395 Brickell Avenue, 14th Floor, Miami, Florida, 33315, as registered with the Florida Division of Corporations.

7.      Azimut is engaged in the business of manufacturing luxury motor yachts in both Italy and the United States and selling and serving them in the United States, through, among others, its agent, broker, retailer and service provider, MarineMax.

8.      This Court's subject matter jurisdiction over the instant suit is proper pursuant to 28 U.S.C. §1331 because this action involves a federal question under the Magnuson-Moss

2

SCHLESINGER & COTZEN, PL
799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

Federal Warranty Act, 15 U.S.C. §2310(d).

9. This Court's subject matter jurisdiction over the instant suit is further proper pursuant to 28 U.S.C.S. §1367(a), which provides for supplemental or pendent jurisdiction over all other claims brought pursuant to state law "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution." *Id.*

10. This Court's subject matter jurisdiction over the instant suit is further proper pursuant to 28 U.S.C.S. §1332, as this case involves an action between 1. a foreign corporation and 2. a Florida corporation and a foreign corporation and 3. the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interests, attorneys' fees and costs.

11. This Court's personal jurisdiction over Azimut is proper pursuant to Fla. Stat. §48.193(2) and Fla. Stat §48.193(1)(a) based upon the following facts:

(a) At all times relevant to this Complaint, Azimut manufactured motor vessels in the United States, including the instant Vessel, and sold them directly to consumers in the United States through its authorized dealers.

(b) At all times relevant to this Complaint, Azimut has used MarineMax to act as their authorized dealer in the State of Florida.

(c) Azimut is aware that consumers in the State of Florida purchase their manufactured luxury motor yachts and use them in the State of Florida

(d) Sales and serving of Azimut yachts in the State of Florida are not occasional, but rather are numerous and systematic.

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

    (e)    Azimut, through its agents set forth above, actively and intentionally promotes the sale and service of its vessels to consumers in the State of Florida.

12.    The Court's personal jurisdiction over Azimut is further proper pursuant to Fla. Stat. §48.193(1)(b) because Azimut committed a tort in the State of Florida.

13.    The Court's personal jurisdiction over Azimut is further proper pursuant to Fla. Stat. §48.193(g) because Azimut breached a contract for warranty which was performed in the State of Florida.

14.    Defendant, MARINEMAX EAST, INC., is a Foreign corporation authorized to transact business in Florida, with its principal place of business located in Clearwater, Florida.

15.    Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C.S. §1391, because a substantial part of the events or omissions giving rise to this claim occurred in Miami-Dade County, Florida based upon the following facts:

    (a)    The motor vessel at issue is currently located in Miami-Dade County, Florida.

    (b)    Plaintiffs purchased the Vessel in Miami-Dade County, Florida, from a MarineMax East dealership, Azimut's authorized dealer, whose address is 2550 South Bayshore Drive, # 1, Coconut Grove, Florida.

    (c)    The express warranty sued upon provides for warranty service to take place at an authorized Azimut dealer and/or service provider, one of which is located in Miami-Dade County, Florida. Specifically, attempts to repair the Vessel were wholly undertaken in Miami-Dade County.

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

16.     This Court has personal jurisdiction over the Defendants. This Court has subject matter jurisdiction over the claims asserted herein, and venue is proper in Miami-Dade County, Florida.

17.     Based upon the actions and omissions of the Defendants, the Plaintiff has been forced to retain the undersigned counsel and pursue litigation by instituting the instant lawsuit to rescind the contract for the purchase of the vessel and recoup the out of pocket expenses it has incurred as a result of maintaining an inoperable and defective vessel.

## GENERAL ALLEGATIONS

18.     On March 25, 2009, Plaintiff purchased the Vessel, an Azimut Model AZ43-FLY 480, from MarineMax for $642,099.46. MarineMax is an authorized dealer of Azimut luxury motor yachts. The Vessel was bought brand new, having never been used.

19.     Plaintiff took delivery of the Vessel on April 29, 2009. See Declaration of Delivery attached hereto as **Exhibit A.** However, Plaintiff would soon discover that it had taken delivery of an inoperable and defective vessel as opposed to a luxury motor yacht as marketed and represented by MarineMax and Azimut.

20.     Almost immediately Plaintiff encountered major inconveniences with the vessel, such as numerous structural, mechanical, and electrical problems. After a leisure trip on the Vessel with Plaintiff, Captain David (a Captain Plaintiff had hired to tour the Bahamas) noticed and documented a list of twenty-five (25) initial problems he found with the Vessel. See attached e-mail dated June 22, 2009, attached hereto as **Exhibit B.**

21.     Problems that have persisted since the date of delivery include the following:

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

a) The air conditioning throughout the Vessel has functioned intermittently. The heat experienced while traveling in South Florida waters further aggravates this problem.

b) The fresh water pump is constantly inoperable.

c) The Raymarine chartplotters do not function properly.

22.     As of November 6, 2009, it was discovered that the starboard engine's raw water pump leaks water on the engine mount, resulting in corrosion to the engine mount and surrounding area. **Two pictures are attached as Exhibit C.**

23.     Also, the engine room's port exhaust is cracked, which has caused a leak. This poses a major health threat in the form of the potential release of carbon monoxide, which could permeate throughout the boat into all the staterooms and salon. **Picture attached as Exhibit D.** In addition, now that the engine room has been exposed to raw saltwater, the integrity of all the components within the engine room has been compromised.

24.     Upon information and belief, Plaintiff believes that the hull laminate has osmotic blistering and or the hull has structural defects.

25.     Upon information and believe, Plaintiff believes that Azimut has failed to comply with R.I.N.A. standards for the Vessel, as described in Azimut's Technical Data brochure discussed more fully below, the aforementioned deficiencies rendering the Vessel's hull structurally unsound, further rendering the Vessel unseaworthy.

26.     Plaintiff is in the process of securing a Marine Surveyor and conducting a Marine Test Report to further document the specific abnormalities that plague the hull's structure and the defects mentioned above and throughout this Complaint. Plaintiff reserves the right to amend and supplement this Complaint with this new information.

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

27.    There are three express warranties contained in Azimut's Warranty Booklet, given to Plaintiff by MarineMax at the time of purchasing the Vessel. See relevant parts of Warranty Booklet attached hereto as **Exhibit E.** Specifically, these express warranties include 1. the Warranty for Yacht Owners; 2. the Warranty for Professional Customers; and 3. the Azimut Master Peace (an extension of Warranty for a total of three years from the date of delivery).

28.    The above-mentioned warranties were not rendered null and void because the defects and non-conformities had been promptly communicated in writing to MarineMax, as per the Warranty Booklet instructions.

29.    Furthermore, the Contents of the Warranty state that the "vessel is guaranteed by your Dealer against original lack of conformity (also called Defect) in materials and workmanship."

30.    One of the express warranties is the Warrant for Yacht Owners, which applies to all vessels purchased by private customers and used exclusively for pleasure cruising. This warranty also covers engines and marine gears installed on the Vessel, such as navigation systems. Specifically, the Warranty for Yacht Owners covers the following:

> a.  "Any defects in material or workmanship arising within twelve months from the delivery of the vessel."
>
> b.  "Any structural defects to the hull which would make the vessel unsuitable for navigation, as well as any formation of osmosis that may occur within 5 years from the delivery of the vessel . . . ."

31.    The other express warranty is the Warranty for Professional Customers, which applies to all vessels purchased by companies or entities, such as Plaintiff. This warranty also has a limited twelve month warranty covering engines and marine gears installed on the Vessel, such

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

as navigation systems.   Specifically, the Warranty for Professional Customers covers the following:

    a.  "Any defects in material or workmanship arising within twelve months from the delivery of the vessel."

    b.  "Any structural defects to the hull which would make the vessel unsuitable for navigation, as well as any formation of osmosis that may occur within 5 years from the delivery of the vessel . . . ."

32.    In addition to Azimut's limited twelve month warranty afforded to all vessels, another express warranty can be purchased. The Master Peace warranty is an extended warranty and maintenance service plan totaling three years from the date of delivery, which was purchased by Plaintiff at the time of purchasing the Vessel. The Master Peace warranty covers the same defects as mentioned in the preceding two paragraphs.

33.    Hence, Plaintiff's defects and repairs were covered under the various warranties. However, the twelve month warranties will soon expire and the Vessel's problems are pervasive.

34.    In addition to the express warranty set forth above, Azimut also published a brochure, entitled "Technical Data", detailing the technical specifications of the forty-three foot Azimut yachts. This brochure made various representations with regards to the Vessel, a copy of which is attached hereto as **Exhibit F.**

35.    Azimut made the aforementioned brochure available to the public as part of its advertising and promotion of its motor vessels and, in particular, the Vessel at issue in the Complaint.

36.    With regard to the hull details, the "Technical Data" states as follows:

DETAILS OF THE HULL

SCHLESINGER & COTZEN, PL
799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

> The structural design for the hull has been approved by the R.I.N.A. This implies a guarantee of the structural quality which is also corroborated by the advance techniques and materials used. *Id.*

37.     "R.I.N.A." stands for the "Royal Institution of Naval Architects", which publishes and approves guidelines for the construction and certification of motor vessels, and its standards are considered among the highest in the industry.

38.     Plaintiff expected when purchasing the Vessel, it would in fact comply with R.I.N.A. rules and standards.

39.     However, upon information and belief, the deficiencies in the Vessel's hull render it noncompliant with R.I.N.A. rules and standards.

40.     On or about June 29, 2009, MarineMax was put on notice of the deficiencies with the Vessel via an e-mail sent from Fernando Schutte to Betty DeVarona (MarineMax Sales & Marketing). The list of the twenty-five problems initially found by Captain David (**Exhibit B**) was included with this e-mail.

41.     The Vessel was taken to Associated Marine Technicians' service yard for the first time on July 6, 2009. Repairs on the Vessel were seemingly underway. On August 11, 2009, Captain Pablo Longa, a Captain which Plaintiff had hired to supervise the repairs to the Vessel, attempted to pick up the Vessel on behalf of Plaintiff from the service yard. However, before even leaving the service yard, an air conditioning problem caused the Captain to immediately return the Vessel for yet another repair. The Captain was finally able to pick up the Vessel from the service yard on August 14, 2009, seemingly in working order.

42.     Irrespective of the month and a half the Vessel remained in the service yard for repairs, on or about August 25, 2009 MarineMax was once again informed of the deficiencies

that still remained with the Vessel. See e-mail from Captain Pablo Longa to Tiora La Porta at MarineMax, dated August 24, 2009, attached hereto as **Exhibit G.**

43.     On or about September 15, 2009, Plaintiff was informed that the problems with the Vessel shown on Captain David's list had been fixed. However, Plaintiff attempted to use the Vessel on the weekend of September 20, 2009, only to find that the air conditioning was not functioning and the motors had shut down, leaving Plaintiff stranded in a harbor. Plaintiff was forced to have the Vessel towed into land.

44.     The Vessel's problems from the weekend of September 20, 2009 were documented in an e-mail between two employees of MarineMax, dated September 22, 2009 and attached hereto as **Exhibit H.** These problems included a "bad" air conditioning pump and a blown fuse that prevented the battery charger from working, ultimately causing the engines to shut down. These problems were unexpected for the Plaintiff, as this was a brand new boat, barely five months old.

45.     On or about September 25, 2009, MarineMax was once again informed about the problems the Vessel was still having, specifically: 1. the Raymarine chartplotters losing signal; 2. the freshwater pump having to be reset constantly; and 3. the air conditioning working intermittently. See e-mail from Captain Pablo Longa to Tiora La Porta at MarineMax, dated September 25, 2009.

46.     In October 2009, MarineMax attempted repairing the persistent problems with the Vessel, as per the e-mail from Tiora La Porta at MarineMax to Frank DeVarona (Sales & Marketing for MarineMax), dated October 14, 2009.

47.     However, as early as November 6, 2009, new problems were found with the Vessel. MarineMax was put on notice of the continuing deficiencies with the Vessel. See e-mail

from Captain Pablo Longa to Tiora La Porta at MarineMax, dated November 6, 2009. Furthermore, the Vessel's electrical problems were outsourced to Concord Marine Electronics and had not been completely repaired as of this date.

48.     After initial attempts to repair the Raymarine chartplotters, on December 17, 2009, a technician from Raymarine inspected same and had the chartplotter panels and GPS antennas replaced. The technician also wanted to replace the flybridge automatic pilot, but was unable to do so because he could not remove the unit from the helm. He mentioned this would have to be done by Azimut or MarineMax before he could make this repair.

49.     On December 17, 2009, MarineMax was informed that the water pump was still not functioning, although MarineMax claimed to have repaired same.

50.     On January 4, 2010, Captain Pablo Longa e-mailed Tiora La Porta at MarineMax with a list of lingering issues the Vessel was experiencing. See e-mail attached hereto as **Exhibit I.** The next day, MarineMax responded that the boat would have to be brought into the service yard once again. Not only does bringing the boat into the service yard for repairs cause monetary expense to the Plaintiff, but this is time that Plaintiff has not been able to spend using and enjoying the Vessel.

51.     The Vessel entered the service yard for a second repair stint on January 20, 2010, this time remaining until February 13, 2010.

52.     Captain Pablo Longa picked up the Vessel on behalf of Plaintiff from the service yard on February 13, 2010. The very same day he picked up the vessel from the service yard, the engine and generator shut down and would not turn on again. Furthermore, although the chartplotter now at least remains powered on, it is experiencing new problems. Also, all the electronics momentarily lose power when the windlass is activated. As such is the present state

of the Vessel's electronics, even though the batteries were replaced the day before the Vessel was taken to the service yard.

53.     On or about February 5, 2010, Plaintiff provided Azimut with formal written notice of the Vessel's deficiencies and their request that Azimut either replace the Vessel with a working vessel or return the purchase price to Plaintiff. See Demand Letter from Schlesinger & Cotzen dated February 5, 2010, attached hereto as **Exhibit J.**

54.     Azimut disclaimed liability for the deficiencies in its letter dated April 23, 2010, attached hereto as **Exhibit K,** stating specifically that Azimut had already inspected the Vessel and "Azimut denies any liability."

55.     On or about February 5, 2010, Plaintiff provided MarineMax with formal written notice of the Vessel's deficiencies and their request that MarineMax either replace the Vessel with a working vessel or return the purchase price to Plaintiff. See Schlesinger & Cotzen, P.L.'s letter dated February 5, 2010, attached hereto as **Exhibit L.** Counsel for MarineMax responded on February 10, 2010 and states that they had requested internal backup documentation to better address Plaintiff's concerns. See letter dated February 10, 2010 from General Counsel of MarineMax to Michael J. Schlesinger, Esq., attached hereto as **Exhibit M.** However, Plaintiff's concerns have yet to be addressed by MarineMax.

56.     Plaintiff has had the Vessel towed to the Associated Marine Technologies service yard twice, both times staying for a period totaling three months. In a period of six months, various technicians from MarineMax, Concord Marine, Electro Nautica, Sonic Marine, Flashpoint Marine, Sea Coast, and Raymarine have come on numerous occasions to diagnose and attempt to repair the Vessel. See Visitor's Log for Capriccio (the Vessel) attached hereto as **Exhibit N.** Plaintiff has hired Captains to oversee the repairs of the Vessel and has paid for sea

trials at its own expense, all in an attempt at bringing the Vessel to proper working order. In addition, after arriving in Miami on numerous occasions to enjoy the Vessel, Plaintiff has had to cancel various plans with friends and family on account of the problems MarineMax and Azimut have been unable to fix.

57.     When Plaintiff has had occasion to use the Vessel, Plaintiff, along with friends and family, have endured many inconveniences, such as a malfunctioning air conditioning in the sweltering South Florida heat, being unable to shower or clean dirty dishes onboard because of a broken water pump, being stranded in the ocean, and enduring a faulty navigation system. In addition, the threat of carbon monoxide poisoning from the leaking exhaust is inescapable.

58.     The Vessel has posed a continuous hassle from its initial acceptance date and despite MarineMax and Azimut's best efforts to correct the problems, they have been unsuccessful. Plaintiff has not only lost faith in Defendants continued service and repair attempts, but is fearful that the Vessel will leave Plaintiff and its passengers stranded once again, possibly in a dangerous situation.

59.     The problems with the Vessel are constant, and will continue even after the warranty periods expire, leaving Plaintiff with a $642,099.46 lemon. In fact, as recently as April 2010, Captain Pablo Longa informed Tiora La Porta at MarineMax that the galley freezer is not working again and there is a crack in the fiberglass behind the port cockpit aft bench seat.

60.     All conditions precedent to filing the instant law suit have been completed as required or waived.

61.     The Plaintiffs were forced to retained the undersigned law firm in pursuit of the claims referenced in this Complaint and have obligated themselves to pay undersigned

reasonable attorney's fees and to reimburse it for costs incurred in conjunction with the instant litigation.

**COUNT I**
**(against Azimut)**
**BREACH OF EXPRESS WARRANTY PURSUANT TO**
**FLA. STAT. § 672.313 AND FLA. STAT. § 672.714: WARRANTY BOOKLET**

62.     Plaintiff re-alleges and incorporates Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

63.     Azimut issued an express warranty, pursuant to the terms contained in its Warranty of Yacht Owners and Warranty of Professional Customers (**Exhibit E**) warranting the hull of the Vessel at issue to be free of structural failures for a period of five (5) years subsequent to its original purchase.

64.     Upon information and belief, Azimut breached this express warranty by constructing and then placing the Vessel into the stream of commerce with structural defects.

65.     Azimut issued an express warranty, pursuant to the terms contained in its Warranty of Yacht Owners and Warranty of Professional Customers (**Exhibit E),** warranting the Vessel free of any defects in material or workmanship. Furthermore, the engine and marine gear are also under warranty.

66.     Azimut breached this express warranty by constructing and then placing the Vessel into the stream of commerce with defects.

67.     As a direct and proximate result of Azimut's breach of the express warranties contained in the Warranty of Yacht Owners and Warranty of Professional Customers, Plaintiffs have incurred substantial expenses in effectuating repairs to correct the ongoing defects for

which Azimut is responsible and would not have had to be incurred had the vessel been built or repaired as warranted.

68.     Furthermore, Plaintiff will continue to experience additional expenses as the warranties will eventually expire, leaving Plaintiff with the same defects he has experienced with the Vessel since the date of delivery.

69.     As a further direct and proximate result of Azimut's breach of the express warranties contained in the Warranty of Yacht Owners and Warranty of Professional Customers, Plaintiff has lost the reasonable use of the Vessel during the period of time necessary to effectuate the repairs to correct the multitude of problems documented in the aforementioned paragraphs.

70.     As a further direct and proximate result of Azimut's breach of the express warranties contained in the Warranty of Yacht Owners and Warranty of Professional Customers, Plaintiffs have been forced to incur reasonable attorney's fees and costs and are thus entitled to reimbursement pursuant to Fla. Stat. §672.714.

**COUNT II:**
**(against Azimut)**
**BREACH OF EXPRESS WARRANTY PURSUANT TO FLA. STAT.**
**§ 672.313 AND FLA. STAT. § 672.714: TECHNICAL DATA**

71.     Plaintiff re-alleges and incorporates Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

72.     Azimut issued an express warranty, pursuant to the terms contained in its Technical Data brochure (**Exhibit F** and outlined beginning in paragraph 34 above), warranting the hull of the Vessel at issue to be compliant with R.I.N.A. rules and standards.

73.     Azimut breached this express warranty by constructing and then placing the

Vessel into the stream of commerce with structural defects.

74.     As a further direct and proximate result of Azimut's breach of the express warranty contained in the Technical Data, Plaintiff suffered damages and lost use of the Vessel, both past and future.

75.     As a further direct and proximate result of Azimut's breach of the express warranty contained in the Technical Data, Plaintiff has been forced to incur reasonable attorney's fees and costs and are thus entitled to their reimbursement pursuant to Fla. Stat. §672.714.

**COUNT III:**
**(against Azimut and MarineMax)**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**PURSUANT TO FLA. STAT. § 672.314:**

76.     Plaintiff re-alleges and incorporates Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

77.     "A warranty that a good shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Fla. Stat. § 672.314.

78.     Plaintiff purchased the Vessel through MarineMax, a boat dealer. Said Vessel was manufactured by Azimut, a boat manufacturer. Hence, MarineMax and Azimut are merchants in goods of that kind.

79.     The Vessel, however, was not of merchantable quality, either when manufactured or when subsequently sold to Plaintiff. In essence, the Vessel was not fit for its ordinary purpose of a luxury cruising vessel.

80.     Plaintiff gave notice of Azimut's and MarineMaz's breach of warranty to MarineMax, Azimut's authorized dealer, within a reasonable time period after discovering the

breach, as set forth more specifically in the general allegations above, and requested that Azimut or MarineMax correct the defects at issue.

81.     On or about February 5, 2010, Plaintiff provided Azimut with formal written notice of the Vessel's deficiencies and their request that Azimut either replace the Vessel with a working vessel or return the purchase price to Plaintiff (see **Exhibit J).** However, Azimut disclaimed liability for the deficiencies in its letter dated April 23, 2010 (see **Exhibit K),** stating specifically that Azimut had already inspected the Vessel and "Azimut denies any liability."

82.     On or about February 5, 2010, Plaintiff provided MarineMax with formal written notice of the Vessel's deficiencies and their request that MarineMax either replace the Vessel with a working vessel or return the purchase price to Plaintiff (see **Exhibit L).** Counsel for MarineMax responded on February 10, 2010 and states that they had requested internal backup documentation to better address Plaintiff's concerns (see **Exhibit M).** However, Plaintiff's concerns have yet to be addressed by MarineMax.

83.     Azimut and MarineMax breached its implied warranty of merchantability by failing to provide a Vessel of merchantable quality to Plaintiff, and further breached this warranty by failing to correct the defects which warranted the vessel unmerchantable, as set forth more fully specifically in the general allegations.

84.     Any attempts to disclaim or limit the implied warranty of merchantability during the three (3) year time period the Master Peace warranty is in effect or the five (5) year time period the express warranty is in effect (for the hull) would, in this instance, cause the warranties to fail of their essential purpose.

85.     As a direct and proximate result of Azimut's and MarineMax's breach of the implied warranty of merchantability, Plaintiff has and will incurr substantial expenses in

17

effectuating repairs to correct the ongoing defects for which Azimut is responsible and would not have had to be incurred had the vessel been built or repaired as warranted.

86.     As a further direct and proximate result of Azimut's and MarineMax's breach of the implied warranty of merchantability, Plaintiff has and will lose the reasonable use of the Vessel during the period of time necessary to effectuate the repairs to correct the ongoing defects mentioned in paragraphs 21-23, and defects included in the exhibits attached to this Complaint, which said defects are incorporated as if referenced herein.

87.     As a further direct and proximate result of Azimut's and MarineMax's breach of the implied warranty of merchantability, Plaintiff has been forced to incur reasonable attorney's fees and costs and are thus entitled to their reimbursement pursuant to Fla. Stat. §672.714.

## COUNT IV:
### (against Azimut and MarineMax)
### BREACH OF IMPLIED WARRANTY PURSUANT TO FLA. STAT. § 672.315: FITNESS FOR A PARTICULAR PURPOSE

88.     Plaintiff re-alleges and incorporates Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

89.     The particular purpose for which the Vessel was required was for the purpose of being used as a luxury, seaworthy, navigable vessel by Plaintiff.

90.     The Vessel, however, was not fit for its particular purpose when sold to Plaintiff, as set forth more specifically in the general allegations.

91.     Plaintiff gave notice of Azimut's and MArineMax's breach of warranty to MarineMax, Azimut's authorized dealer, within a reasonable time period after discovering the breach, and requested that Azimut or MarineMax correct the defects at issue.

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

92.     On or about February 5, 2010, Plaintiff provided Azimut with formal written notice of the Vessel's deficiencies and their request that Azimut either replace the Vessel with a working vessel or return the purchase price to Plaintiff (see **Exhibit J).** However, Azimut disclaimed liability for the deficiencies in its letter dated April 23, 2010 (see **Exhibit K),** stating specifically that Azimut had already inspected the Vessel and "Azimut denies any liability."

93.     On or about February 5, 2010, Plaintiff provided MarineMax with formal written notice of the Vessel's deficiencies and their request that MarineMax either replace the Vessel with a working vessel or return the purchase price to Plaintiff (see **Exhibit L).** Counsel for MarineMax responded on February 10, 2010 and states that they had requested internal backup documentation to better address Plaintiff's concerns (see **Exhibit M).** However, Plaintiff's concerns have yet to be addressed by MarineMax.

94.     Azimut breached its implied warranty of fitness for its particular purpose by failing to provide a Vessel that was fit for the purpose of being used as a luxury, seaworthy, navigable vessel to Plaintiff, and further breached this warranty by failing to correct the defects which warranted the vessel unfit for its particular purpose, as set forth more specifically in the general allegations.

95.     Any attempts to disclaim or limit the implied warranty of merchantability during the three (3) year time period the Master Peace warranty is in effect or the five (5) year time period the express warranty is in effect (for the hull) would, in this instance, cause the warranties to fail of their essential purpose.

96.     As a direct and proximate result of Azimut's and MarineMax's breach of the implied warranty of merchantability, Plaintiff has and will incur substantial expenses in effectuating repairs to correct the ongoing defects for which Azimut is responsible and would

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

not have had to be incurred had the vessel been built or repaired as warranted.

97.    As a further direct and proximate result of Azimut's breach of the implied warranty of merchantability, Plaintiff has and will lose the reasonable use of the Vessel during the period of time necessary to effectuate the repairs to correct the ongoing defects mentioned in paragraphs 21-23, and further defects included in the exhibits attached to this Complaint, which said defects are incorporated as if referenced herein.

98.    As a further direct and proximate result of Azimut's and MarineMax's breach of the implied warranty of merchantability, Plaintiff has been forced to incur reasonable attorney's fees and costs.

**COUNT V:**
**(against Azimut and MarineMax)**
**VIOLATION OF MAGNUSON-MOSS ACT**

99.    Plaintiff re-alleges and incorporates Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

100.    At all times material hereto, the Vessel was a "consumer product" within the contemplation of 15 U.S.C. §2310 *et seq.* (the "Magnuson-Moss Act").

101.    At all times material hereto, Azimut was a seller, supplier and/or manufacturer of the Vessel, a consumer product, within the contemplation of the Magnuson-Moss Act.

102.    At all times material hereto, MarineMax was a seller, supplier and/or servicer of the Vessel, a consumer product, within the contemplation of the Magnuson-Moss Act.

103.    Azimut provided written warranties to the Vessel, encompassed in the Warranty Booklet, specifically the Warranty of Yacht Owners and the Warranty of Professional Customers (see **Exhibit E).**

104.    Plaintiff is a consumer who has been damaged by the failure of Azimut, a

supplier/warrantor, and MarineMax, a supplier/service contractor, to comply with its obligation under a written warranty, implied warranty, or service contract.

105. Although Azimut and MarineMax have attempted to repair the aforementioned defects, its attempts have been unsuccessful, and Plaintiff is now entitled to bring this action. However, this Vessel is simply a lemon.

106. Azimut and MarineMax violated the Magnuson-Moss Act by delivering into the stream of commerce the Vessel, which had latent and substantial ongoing defects, including the anticipated structural hull defects, which rendered the Vessel defective or inoperative in violation of the express warranties referenced above.

107. Azimut and MarineMax violated the Magnuson-Moss Act by breaching a warranty of merchantability by delivering into the stream of commerce the Vessel, which had latent and substantial ongoing defects, including the anticipated structural hull defects, which rendered the Vessel defective or inoperative.

108. Azimut and MarineMax violated the Magnuson-Moss Act by breaching a warranty of fitness for particular purpose by delivering into the stream of commerce the Vessel, which had latent and substantial structural hull defects which rendered the Vessel defective or inoperative.

109. Plaintiff provided Azimut and MarineMax with notice of the aforementioned defects and requested that Azimut and MarineMax repair the defects under the terms of the written warranties referenced herein.

110. Azimut and MarineMax, albeit after their best efforts, failed to completely repair the defects in accordance with the written warranties or to otherwise provide an adequate remedy to Plaintiff for Azimut's breach of its warranties.

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

111.    Plaintiff retained the undersigned law firm in order to pursue its remedies against AZIMUT and are obligated to pay it reasonable attorney's fees, for which they are entitled to reimbursement pursuant to 15 U.S.C.S. §2310(d).

112.    As a direct and proximate result of Azimut's and MarineMax's breach of its written and implied warranties, Plaintiff has suffered direct and consequential damages. Plaintiff has also suffered incidental damages.

**COUNT VI:**
**(against Azimut and MarineMax)**
**VIOLATION OF FLORIDA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**

113.    Plaintiff re-alleges and incorporates Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

114.    The Azimut Technical Data brochure, which is part of Defendants' sales advertisement, was made available to the consuming public in the State of Florida by Azimut or through its authorized dealers, to promote the sale and use of Azimut's vessels.

115.    The sale of the Vessel at issue was a "consumer transaction" within the meaning and scope of the Florida Unfair and Deceptive Trade Practices Act., Fla. Stat. § 501.201 *et seq.*

116.    At all times relevant hereto, Plaintiff was a "consumer" within the meaning and scope of the Florida Unfair and Deceptive Trade Practices Act., Fla. Stat. § 501.201 *et seq.*

117.    Azimut violated the Vessel's specifications outlined in its Technical Data brochure, allowing the public to believe that Azimut had constructed the Vessel free of defects and in compliance with RINA standards.

118.    These representations were either false or Azimut and MarineMax should have

22

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

known they were false, or the representations were deceptive and capable of misleading the public.

119. The defects explained in the general allegations, along with any defects shown in the exhibits attached to this Complaint, render it inadequate as a luxury, seaworthy vessel, although represented as such by Azimut and MarineMax. This constitutes an unlawful, unfair or deceptive act under Fla. Stat. §501.204.

120. Any defects found in the hull and or the pending Marine Test Report, which defects shall be incorporated as if referenced herein, render it non-complaint with RINA standards.

121. Azimut's representation that the Vessel was built according to RINA stanrdards constitutes an unlawful, unfair or deceptive act under Fla. Stat. §501.204.

122. Plaintiff has been damaged as a direct and proximate result of Azimut's and MarineMax's unlawful, unfair or deceptive act as set forth above.

123. In addition to recovery of the damages Plaintiff has incurred as a result of the unlawful, unfair and deceptive act as set forth above, Plaintiff is entitled to recover reasonable attorney's fees and court costs pursuant to Fla. Stat. § 501.2105.

## COUNT VII:
### (against Azimut and MarineMax)
### NEGLIGENT MISREPRESENTATION

124. Plaintiff re-alleges and incorporates Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

125. In its Technical Data brochure, Azimut represented to the public and, in particular, to Plaintiff, that the Vessel was complaint with RINA standards.

126. This representation was a representation of material fact.

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

127.    This representation was false, because, upon information and belief, the Vessel is not complaint with RINA standards.

128.    Azimut and MarineMax knew or should have known that this representation of material fact was false at the time the representation was made or was false at the time the Vessel at issue was built or was false at the time the Vessel at issue was sold.

129.    At no time did Azimut or MarineMax recall or correct the representations made in the Technical Data brochure.

130.    Azimut made this representation to induce purchasers, such as Plaintiff, to purchase the Vessel, and knowingly allowed the representation contained in its Technical Data brochure to be published and used without any recall or correction of the misrepresentation.

131.    Azimut violated the Vessel's specific representations supplied by its Technical Data brochure when it manufactured and sold the Vessel to Plaintiff.

132.    MarineMax represented to Plaintiff that this Vessel was new and in working condition, and said representations were relied on by Plaintiff when purchasing the Vessel. However, this Vessel was defective and in need of constant repair, as documented by the evidence attached to this complaint.

133.    As a direct and proximate result of Azimut's and MarineMax's negligent misrepresentation, Plaintiff has suffered damages, including incurring costs in effectuating repairs to the Vessel due to its ongoing defects, future costs due to hull deficiencies, decrease in the value of the vessel caused by these ongoing defects and hull deficiencies, and loss of use of the Vessel while repairs are effectuated to correct its defects and hull deficiencies.

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff demands judgment for damages against Defendants, together with interest, attorney's fees and court costs, including Defendants reacquiring possession and title of the Vessel and returning the purchase price of the Vessel to Plaintiff or providing Plaintiff with a working Vessel, free of defects, and all other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demand trial by jury on all issues triable as of right by jury.

DATED: April 29, 2010

SCHLESINGER & COTZEN, PL

799 BRICKELL PLAZA · SUITE 700 · MIAMI, FLORIDA 33131 · TELEPHONE 305.373.8993 · FAX 305.373.8098

Respectfully submitted,

SCHLESINGER AND COTZEN, P.L.
Counsel for Plaintiff
799 Brickell Plaza, Suite 700
Miami, FL 33131
Phone:  305-373-8993
Facsimile:  305-373-8098
Email:  mc@scflalaw.com

By: _____
Michael L. Cotzen, Esq.
Fla. Bar No. 166472

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28 day of April 2010, a true and correct copy

of the foregoing was sent via US Mail to the individuals on the attached Service List.

By: _____
Michael L. Cotzen